518-0491 Jeff Baker v. The Workers' Compensation Commission May it proceed. Thank you, Your Honor. Please report. Mr. Neumeyer, my name is David Walsh. I am here today on behalf of Jeff Baker in regard to the wood accident which he sustained on April 27, 2009. We are soon to celebrate the 10th year of that accident. And I emphasize throughout my argument that there is no dispute about the fact that Mr. Baker sustained an accident on April 27, 2009. Nor is there any dispute regarding the mechanics of the accident. Mr. Baker was employed by a company that made roof bolts for the coal mining industry. Mr. Baker was approaching a piece of machinery. In essence, ascending a movable ladder. Steps, I should say, not ladder. The movable steps had been moved back away from the machine. A mat had covered the gap between as he approached the machine. He fell through this ladder with enough force to fracture his ankle, strike his elbow, and most importantly to fall on his outstretched hands against the piece of machinery. The medical treatment that ensued was immediate hospitalization and then referral to orthopedic doctors. And with this, Mr. Baker then embarked upon a course of medical treatment and has embarked on this medical treatment for the past 10 years. At issue is whether Mr. Baker's condition of ill-being, as it currently exists, and most importantly as it existed, at the time of his second lung condition, is causally connected to this accident. And Dr. Fletcher said it was, right? Dr. Fletcher said it was. Dr. Lee said what? Dr. Lee said it was not. We agree on that. So where does that leave us? Where does that leave you, I should say? Where does that leave me? What I am focusing on is the fact that from the very beginning of the medical treatment, Mr. Baker has presented with a description of symptomatology. He has talked about pain in his hands and wrists that will radiate into his F-type, forearms up to his elbows. And I have throughout the case argued, and I believe it is agreed, that these symptoms have been continuous. There is a difference of opinion as to whether these symptoms have been consistent. But my position is this is not a matter of the moving symptom. This is not a case where it has gone from body part to body part. Mr. Baker has continuously complained of the symptomatology in his wrists, his hands, and his arms. And when I say he embarked on a course of medical treatment, initially he was diagnosed by Dr. Morgan with bilateral querbains, which diagnosis was supported by a respondent examining the doctor. And as a result of that diagnosis, Mr. Baker underwent surgery, right, the querbains were released on 12-9-09. And I point in my recitation... I think we've got to get to the basic issue. Why is it that you say that the Commission should not or could not rely on Dr. Lee's opinion? You find that the cervical spondylosis was merely from aging, not from a workplace accident that happened years earlier. And part of his reasoning is there was no mention of any problem with the neck until six years after, six months after the fall, six years after the fall. Let me reemphasize that. Mr. Baker testified. I never had any complex neck. Mr. Baker said this was never something I brought up. I didn't have it. And at the time of his last testimony, the second night he was officially testified, I never had any complex neck. So what I'm focusing on is the fact that he has consistently, and I contend continuously, expressed these problems. I think I see your point. In addition to the opinion of Fletcher, you're saying the history of the symptomatology supports it. But let me ask you this. Who's Dr. Schiaffi? Dr. Schiaffi is the surgeon whom Dr. Fletcher referred Mr. Baker to after Dr. Fletcher concluded his symptoms are in fact a product of his neck. And obviously you're aware of the fact that Schiaffi, the spine surgeon, said, I do, quote unquote, not believe this is a work issue. So what do you make of their opinion? In his e-mails he makes that, and I don't know what he means by that. Well, that would seem to indicate the workplace accident did not cause a cervical condition. Why would he say that? Well, I refer to his initial constipation, June 22nd of 2018, when he initially sees Mr. Baker. And I point out that while these records were admitted into evidence and accepted into evidence, the record for some reason did not have that particular quote, well, that particular chart, yes. But on June 22nd, he sees a 43-year-old male with bilateral radiculopathy from a broad-based disc osteophytomies. The patient has had many years of treatment, and even treatment for other diagnoses. He has been searching for a way to relieve his pain. He has had radiculopathy and a quervain surgery with little relief. He has negative EMGs and negative clinical exams from time to time. He has a C5-6 moderate disc, which can correlate to his pain distribution. His symptoms, and I drop down, I'm not going to read the entire entry, but his symptoms appear to correlate with his pathology. I believe in the end it will improve, he proposed a surgery, he says, I believe in the end it will improve his symptoms. The symptoms are initially treated as the quervains, and that is the law of the case. Speaking of law of the case. Speaking of the law of the case. When these symptoms, and I point out that after his initial surgery, he did not, it is reported, he did not have complete resolution of his symptoms. He undergoes a second left quervain release, 224-10. In follow-up on 3-4-10, March 4th of 2010, he still had one hand in the right hand with the right hand thrombin. With that, perhaps his diagnosis is radial tunnel. And so Dr. Morgan refers to his partner, Dr. Young, Dr. Young says, yes, he has radial tunnel. Dr. Young testifies, this is probably connected to the left accident. I'm going to do a right radial tunnel surgery, which he does, and this does not alleviate the symptoms. I'm not going to do a left surgery until the right is resolved. And Mr. Baker now is treating Dr. Young with a radial tunnel. Dr. Young is asked by me, what's next? What is the next step in his treatment? And Dr. Young, unilaterally, voluntarily says to me, after the trial, after the 19-day waiting, after the preliminary decision, after the law of the case is established, you know, I don't think a radial tunnel symptom is related to his original living. So with that, then, Mr. Baker now inquires, on another hand, what is my diagnosis? What is causing these symptoms? And so you, in essence, N.K., you've got conflicting opinions, and the argument could be made, obviously, it's the commission's providence to believe which expert they want in the weight and credibility, but you're also saying that your side of the case is supported by the entire history of his complaints, his problems, and what's documented. Is that what you're saying? I'm looking at the chain of events, the cases that I decided to talk about, the chain of events. Was he in good health before this accident? He was in good health. As a matter of fact, he had treated for other injuries with Dr. Morgan long prior to this case. Because sometimes people get confused over the scope of the chain of events, and that foundational element is the person must be in good health to begin with. He was in good health to begin with to the extent that he treated with these doctors before, to full resolution to that point. Okay. So, I'm obviously focusing on the chain of events. I'm obviously focusing on the symptomatology. I am emphasizing that as early as September 17th of 2010, before embarking on the radiotherapy treatment, Mr. Deckard undergoes a functional capacity evaluation, and the functional capacity evaluation concludes that he is not able to go back to work because of his symptomatology. That inability to return to work has never changed. Years later, Dr. Fletcher does a second functional capacity evaluation, and that says he is not going to go back to work in the roof-bolt industry. His symptoms, his symptoms, Mr. Deckard's symptoms, have not resolved. And Dr. Shoukri, while not testifying and while not rendering a formal cause of connection opinion, does enter this chart note in which he says, he has had these problems, he has had these symptoms, he has had these surgeries based on these diagnoses, that has not resolved the condition of ill-being. Nevertheless, you don't know why he said it wasn't related to work. I don't know. He didn't say it was, he didn't say it wasn't. He did not. Okay. But he does say the ACDF surgery, which I am proposing based on the clinical findings that I am seeing, will relieve him of... I missed it. I believe, in the end, will improve his symptoms. Now, when I undertake representation of people in workers' compensation services, I always say that this is designed to address the condition of ill-being that you have sustained as a result of a work injury. There is no dispute that Mr. Baker has these conditions of ill-being. And there is no dispute that these conditions of ill-being arose, began, as a result of this accident on 4-27. There certainly is a dispute if you listen to Dr. Lee. Beg your pardon? There certainly is a dispute if you listen to Dr. Lee. Well, Dr. Lee is saying that he doesn't feel that the clinical findings are causally connected to the 4-27-09 accident. I think he went further than that, didn't he? Testified that he considered very carefully the case. The work injury did not cause the petitioner's condition or his symptoms. Yes, it did cause it, and he explained, the more likely cause was just the degenerative shrinkage that all of our spines are undergoing. And the arbitrator seemed to find further support in the fact that there was a long period of time that expired between the time of the accident and the time anyone diagnosed the problem of this being a cervical spine. Exactly. So why is that against the manifest way of the evidence? Because the symptomatology, the symptomatology reports, I understand that you're saying the symptomatology report is not based on the work accident, but there's no explanation from Dr. Lee as to the continuous and regular presentation of the symptomatology since then. Well, he says, the arbitrator finds near that Lee testified that it's degenerative changes that all of our spines undergo over time. So Lee did come up with an explanation. The arbitrator finds overwhelming weight of credible evidence that the petitioner's cervical spine condition is in no way related to this work accident based upon the foregoing, the failure to establish, and no award will be made. So I suppose in order to rule in your favor, we have to find that Lee is unbelievable. Well, you have to be able to conclude that regardless of what Dr. Lee has said, Dr. Lee is saying, I believe now seven years after the fact, that this symptomatology is not related to the 427-09 work injury. My question to Dr. Lee, then, what is the basis of these symptoms that are going back to 427-09? Those symptoms, maybe those symptoms are a product of a degenerative... Why do you say it goes back to 427-09? What was the first time after 427-09 that this man was diagnosed with a problem with his cervical spine? He's not diagnosed with the cervical spine until he sees Dr. Fletcher. And when was that? That was in 2015. So from 2009 to 2015, there's no diagnosis of a problem with the cervical spine, and you say that the symptoms go all the way back to 2009? Yes. Why? Because they do. And this is the crux of my argument. If the symptomatology that's being presented by Mr. Baker in April of 2009, the symptomatology of the hands, the wrists, the arms, the kneeling up to the elbows, if that symptomatology is in fact the product of a cervical injury that has gone diagnosed, misdiagnosed, as Dr. Fletcher said, then it is causally connected, the cervical spine, is causally connected to the work injury. Okay, you'll have time in reply if I may imply. Thank you. Good morning. May it please the court. Mr. Moss. My name is Brendan Meyer, and I represent Hanover, USA, and I support this compensation case. There's a couple of issues that he's brought up, and especially the reply brief, that I do take exception with and want to address today. The first thing is he argues with this chain of events argument that he's never reached maximum medical improvement, and that this finding by the commission is a mismanifest way of the evidence. Dr. Brown put him at MMI on January 7, 2014. Dr. Young testified at his deposition in January 2015, and he also believed he was at MMI. And Petitioner's own hired expert, Dr. Stewart, did an evaluation in September 2015 and concluded he was at MMI. And those are all in addition to Dr. Lee, who was served by a spine surgeon, who also opined he was at MMI. So that should be sufficient to establish he was at MMI. Yes. He's arguing that, in arguing that this finding, that he's not at MMI, in arguing that it's a mismanifest way of the evidence, goes against the testimony of four doctors, and one of which he, that Petitioner hired himself. In his reply brief, he talks about it's an undisputed fact that Petitioner continues to experience these pain symptoms. And he asks you to look at this case as a whole, and how far back his complaints have gone. And I also ask that the court do that, because the records in this case, even those of his own hired expert, are filled with examples of symptom magnification. Furthermore, the primary care doctor's records that were admitted into evidence document a vigorous exercise routine of running miles each day, then lifting weights at the gym, oftentimes on the same day. So this was important to Dr. Lee, because these symptoms haven't been consistent. I just put it up with Justice Hoffman. There was this long hiatus between the accident and when he started making the complaint. Yeah. In fact, one of the cases he cites, this Surrey case, you know, where a bird's nest strikes the man's eye. And he argues that case is malicious. And that case was 17 days from this bird nest striking his eye to the man going blind in that eye. It was 20 months from the work accident to the first mention of arm complaints by a treating physician, which was Dr. Morgan. All right. You've got, obviously, evidence there. So let me ask this. How do you respond to his allegation? He goes, but aha, we have these functional capacity evaluations that support us. What do you make of that? So what I make of that is look at the testimony of Dr. Stewart, who was his hired IME doctor. And the functional capacity evaluation shows, again, the symptom magnification, not putting forth full effort. Dr. Stewart. Did he say that in the report? In the functional capacity evaluation report? Yeah. And have any comments about possible malingering? I believe so. I mean, I want to have it in front of me. You have to be careful when you say that. You're indicating to me that there was some evidence of malingering. So what Dr. Stewart says is that he goes in to do this testing where he explained they touch the hand with these filaments. And he does the, I don't know how to pronounce it, where they squeeze the grip strength tester. And he tells them, at your last functional capacity evaluation, your effort was questioned. I want you to go in there and give it all you have. And Dr. Stewart testified that despite this pep talk, the results are all over the place. It didn't make any anatomic sense. And his own expert testified and told us he's exhibiting symptom magnification. There's also this statement that the petitioner's brief that responded has offered no evidence suggesting the proposed cervical spine surgery is not necessary to cure or alleviate the effects of the petitioner's injury. That's just false. Dr. Lee testified the work injury did not cause the condition or the symptoms in the cervical spine. Petitioner's own expert, Dr. Stewart, testified that petitioner's condition in the cervical spine is not related to the work injury. Dr. Fletcher is alone in this opinion. Dr. Fletcher is a hired occupational medicine doctor, hired for a medical legal exam. He doesn't have the qualifications to do the surgery or treat the condition being diagnosed later by Dr. Shockey. Dr. Shockey's opinion, as was noted earlier, is not offered in the evidence in this case. The only clue we have as to what his opinion may be is that interoffice email where he states he does not believe this is a work accomplishment. That's a pretty bold or unusual statement, isn't it? Yeah, I believe so. I think in the absence of his testimony, we have to look at what indication his opinion might be. And there's an indication in the email that he was saying, yeah, this should go under his private health insurance because it's not what has come. At any event, at the end of the day, your argument is there's more than sufficient evidence to support the commission's decision, right? Exactly. I won't belabor that point, but maybe just a little bit. It's Dr. Fletcher. If you're going to believe Dr. Fletcher in this case, you have to believe that Dr. Morgan, who was an orthopedic surgeon who initially treated him for this, missed this neck injury. You have to believe that Dr. Browdy, another orthopedic surgeon who performed an IME back in 2010, missed this neck injury. You have to believe that Dr. Olinger, another orthopedic surgeon who saw him on two occasions, once in 2009 and again in 2010, missed this neck injury. You have to believe that Dr. Young, a surgeon who treated him over the course of years, could not reach a diagnosis, and no diagnostic studies missed this as a neck injury. You have to believe that the objective nerve conduction studies and the doctors who read them, all of which were negative for cervical radiculopathy, including the study from September 2013 that Dr. Young described in regards to the cervical spine as quote, too good to really reveal a false negative, and explained it was quote, without question a negative nerve study, that they still missed this as a neck injury. You have to disbelieve Dr. Brown, and one thing that didn't come up in Mr. Moss's oral argument that I won't point out, you have to disbelieve Dr. Juergens, who treated him in 2013 and 2014, after Dr. Young was unable to reach a diagnosis. You have to disbelieve Dr. Juergens, who specifically examined the cervical spine. He noted it had a normal cervical range of motion without pain. He had a normal neurologic exam at that time, and so to believe Dr. Fletcher, you have to believe that Dr. Juergens despite doing this specific exam, just missed it. You have to disbelieve everything I've discussed already with Dr. Stewart. You have to disbelieve the only board certified orthopedic spine specialist who has an opinion or testimony in this case, Dr. Lee, and he said there's no way this is related to a work injury. And if you don't disbelieve all of those doctors, the conclusion is what? If you don't disbelieve all of those doctors, your conclusion is the same as if it's related to his work accident. I'll just close by saying I want to be brief. Mr. Baker does not live in a bubble. He had this accident in 2009. If you look at the records I discussed in my brief, he was assaulted in 2010, two months before he does report these arm symptoms to Dr. Morgan. It sounds like it was a serious assault. There were six men. The records say he was beaten badly. He had some testing done after that assault. And in furthermore, when you look at this vigorous exercise routine that he starts doing, I think his testimony was that it started around 2012. His primary care doctor records state that by 2015, he's running and lifting weights like I said before. When you look at the whole picture, this just doesn't relate back to 2009. It also goes to his claim that he's not totally disabled. He's able to run five miles in a day. If you guys don't have any more questions, that's all I have. Thank you. Thank you, Counsel. Counsel, you may reply. Briefly, Your Honor, let's be sure  in regard to Dr. Lee and my statement that we're on the same page with no testimony from Dr. Lee that petition doesn't need this surgery. It isn't going to cure him of his condition. I have a quote from Dr. Shockley where he does believe in the end that the surgical procedure will improve his symptoms. In regard to the incident of October 1st, 2010, the application that Brett just commented on, this is following the petitioner's presentation of these continuous regular hand and arm complaints. Furthermore, as set out in my brief, the testing that was found in the first and third position was all negative in regard to the test that resulted from that incident. I am aware that the issue of symptom magnification is present in the case and consequently each of the doctors were asked as to whether Mr. Baker is exhibiting symptom magnification. In regard to Dr. Stewart, he says that while he is noting symptom magnification his tester indicated that the tests were not inconsistent. To quote Dr. Stewart, a person's symptoms are going to be varied as varied as people. Dr. Morgan said I've treated Mr. Baker in the past. I've never seen any instance of symptom magnification. Dr. Brown was very clear in his indications that he didn't see any issues of symptom magnification. And moreover, the symptoms that have been at the center of this case and which I again contend have existed from the beginning are symptoms to the hand, the wrist, and the arm. Mr. Baker has never said, Oh, now my neck is hurting. Oh, I've got something new. The newness is whether or not the cervical findings are causing these symptoms. If the court finds these symptoms have existed from the beginning, then the reasonable implication is that the cervical condition is causing the symptoms. It's a three-step argument. So consequently, because these symptoms early on precluded Mr. Baker from returning to the court, because these symptoms continue to persist, it is my contention that the commission was wrong. The arbitrator was wrong in finding that he has reached maximum medical improvement. You cannot say doctor after doctor, I don't know what his medical condition is, throw up your hands and declare MMI. That law doesn't work that way. There has to be a diagnosis and there has to be a resolution of the condition of the OB if it is concluded the condition of the OB is causally connected to a work accident. And the manifest way of the record suggests that these symptoms are those from this initial diagnosis. Thank you. Thank you counsel both for your arguments in this matter and the written disposition shall